IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LOCAL 731 I.B. OF T. EXCAVATORS | : | CIVIL ACTION |
| AND PAVERS PENSION TRUST FUND, et al. | : | |
| | : | |
| v. | : | |
| | : | NO. 09-799 |
| DAVID C. SWANSON, et al. | : | |

## MEMORANDUM RE: MOTION TO DISMISS

**Baylson, J.**                                                                       **June 14, 2011**

### I.    Introduction

Lead Plaintiff Zhengxu He ("Plaintiff") brings this consolidated securities fraud class

action on behalf of individuals who purchased or otherwise acquired the publicly traded

securities of R.H. Donnelley ("RHD") between October 26, 2006 and May 29, 2009 (the "Class

Period"). RHD was a leading publisher of print yellow pages directories and provider of online

local commercial search tools prior to filing for bankruptcy at the end of the Class Period.

The Consolidated Class Action Complaint ("Complaint") asserts claims for violation of

Section 10(b) of the Securities Exchange Act of 1934 ("the Securities Exchange Act"), 15 U.S.C.

§ 78j(b), Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), against David C. Swanson

("Swanson"), the Chairman of the Board and CEO of RHD during the Class Period; Steven M.

Blondy ("Blondy"), the Executive Vice President and Chief Financial Officer ("CFO") of RHD

during the Class Period; Peter J. McDonald ("McDonald"), the President and Chief Operating

Officer ("COO") of RHD from October 27, 2004 until his retirement on September 1, 2008; and

George F. Bednarz ("Bednarz"), the Executive Vice President of Enterprise Sales and Operations

1

for RHD from June 2008[1] through the end of the Class Period (collectively, "Defendants").

The shareholders' theory is that Defendants deliberately misrepresented the financial performance of RHD, including the viability of its yellow pages publishing business, resulting in artificial inflation of RHD's stock price until the market learned the truth and the stock price tumbled. Defendants have filed a Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 39) for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The Court has reviewed the exceptionally detailed Complaint and the extensive briefing filed by the parties, and held oral argument on the motion. The Court finds that the Complaint pleads sufficient facts to state claims under the Securities Exchange Act and denies the Motion to Dismiss.

## II.    Factual and Procedural History

### A.    Factual Background

According to the Complaint, Defendants engaged in misconduct during the Class Period by inaccurately portraying RHD's financial results and customer demand for its core product, print yellow pages directories. Compl. ¶¶ 3-5. Defendants, as senior executive officers and directors of RHD, had access to confidential and proprietary information about RHD, including its operations, finances, financial condition, present and future business prospects, and material adverse non-public information about RHD. Compl. ¶ 26. Defendants had authority to control the conduct of RHD's business and the contents of its reports, press releases and presentations to

---

[1] The Complaint does not state what Bednarz's position was at RHD before he was promoted to Executive Vice President of Enterprise Sales and Operations in June 2008. See Compl. ¶ 390. However, the Complaint includes data about Bednarz's compensation at RHD and stock sales for the entire Class Period. Compl. ¶¶ 258, 260-61, 456.

securities analysts. Compl. ¶¶ 27-28.

The 221-page Complaint bases its allegations in part on information from twenty-six confidential insider witnesses, identified by position, duties, location, and dates of employment. Compl. ¶¶ 37-64. These witnesses provided information about RHD's business, including advertising sales for print yellow pages, which generated a majority of RHD's revenue, and sales of listings and ads on the internet. Compl. ¶¶ 65-66. In 2003, RHD began executing a "growth by acquisition" strategy, purchasing at least four directory publishing businesses for almost $14 billion total between 2003 and 2007, the majority of which the company took on as debt. Compl. ¶¶ 67-68. Swanson and Blondy led the acquisition strategy, with the goal of growing RHD's high-margin print yellow pages business. Compl. ¶¶ 70-71. Some of the acquired companies had artificially inflated sales and bad debt. Compl. ¶ 72.

Corporate management, including Defendants, had access to industry reports, internal and external research reports, information from customers, and financial data showing declining sales, and attended executive meetings where decreasing margins on print advertising was discussed. Compl. ¶¶ 82, 146, 158. Company insiders saw a "secular shift" away from print yellow pages usage and towards online advertising, independent of widespread economic woes, causing RHD to lose millions of dollars each year. Compl. ¶¶ 76-81. RHD substantially discounted the price of print yellow pages advertising and focused strategically on expanding the market for print directories, despite the diminishing return on investment. Compl. ¶¶ 140-141. Meanwhile, slower sales of internet advertising, increasing bad debt, and growing numbers of "credit management" accounts failing to pay their obligations further cut into RHD's profitability. Compl. ¶¶ 173, 176, 202. RHD took three goodwill impairments charges and

failed to make a $55 million interest payment. Compl. ¶¶ 246, 379, 399, 432, 443. The SEC asked RHD to amend its Form 10-K "to discuss management's analysis of the reasons behind the company's stock decline and the steps management is taking, and plans to take, to counter the decline. . .." Compl. ¶ 374. On December 31, 2008, after the New York Stock Exchange ("NYSE") delisted RHD for failure to comply with listing criteria, an RHD press release claimed "[t]he Company's operations remain healthy, and the NYSE listing suspension does not impair R.H. Donnelley's ability to continue to operate on a business as usual basis as well as invest in new and enhanced online platforms and capabilities." Compl. ¶¶ 427, 429.

During the Class Period, Defendants made repeated positive statements about the yellow pages business, including that print directories had "high usage"; the business was "very strong," "very healthy," and "robust"; and there was a "huge misperception" that "no one uses the Yellow Pages anymore." Compl. ¶ 74. Defendants said the decline in print advertising sales was "predominantly cyclical" and attributable to the economic downturn. Compl. ¶ 75. Defendants said RHD expected to resume growth in print advertising and denied the existence of a secular shift. Compl. ¶¶ 147-149. RHD relied on seemingly independent Yellow Pages Association ("YPA") studies to tout the success of the industry, although Swanson was the Chairman of the Board of Directors of YPA from October 2007. Compl. ¶ 228.

The Complaint alleges, in great detail, specific statements that Defendants made during the Class Period to the press, on conference calls, in financial reports, and/or in SEC filings concerning the strength of RHD's business and its future prospects, and changes in the stock

price that occurred in temporal relation to these statements. Compl. ¶¶ 280-453.[2] Plaintiff

claims that Defendants had an incentive to mask the ongoing permanent decline in the business

because company policy aligned executive salaries with performance. Compl. ¶¶ 257-58.

Defendants earned total compensation of approximately $30.7 million (Swanson), $8.7 million

(Blondy), $5 million (Bednarz) and $14.9 million (McDonald) during the Class Period. Compl. ¶

258.

RHD's stock price was inflated to a high of $83.90 per share during the Class Period,

around which time Defendants sold a total of 267,278 shares near peak value, with each

---

[2] Examples of the alleged misrepresentations include:
- In an October 26, 2006 conference call, Swanson made statements that RHD's "healthy business" had "long-term sustainable growth"; "our usage share in print is holding steady"; and "the core directors are retaining their usage and even growing." Compl. ¶¶ 281, 283.
- Speaking at media conferences in 2007, Blondy said that "the core directory business off-line continues to be very strong"; "the print Yellow Page business. . . remains very healthy and robust business"; "the value equation for advertisers has never been stronger"; "[t]he reality is 10 to 29 year olds use print Yellow Pages more often than average adults"; and denounced the "myth" that "yellow pages no longer create significant value for advertisers." Compl. ¶¶ 289, 304, 317. Blondy rejected the "conclu[sion] that the Internet margins might be lower than the print margins," saying, "I don't think that is a fair reflection of what the value is there." Compl. ¶ 306.
- In a March 1, 2007 conference call, McDonald stated that "[w]e can already see some of the trends consistently moving in the right direction," and that "both the print core books and the plus directories, or companion directories – are all very positive." Compl. ¶¶ 294, 296, 297.
- At a March 11, 2008 conference, Swanson stated that "one of the most misreported and misunderstood things in local search" is a "secular decline that the facts quite simply just don't support"; there was "hardly a tipping point or a signal of significant secular shift"; "you see so much online search happening but not a big decline in print usage;" and "we feel very, very good about the role that our core print and online Yellow Pages continue to play in the market place and we believe it will continue to play for a long time. Print is much more stable in terms of customer usage than most people give it credit for. And the value that our products are delivering the local business person remains very, very strong." Compl. ¶ 364.

Defendant earning between approximately $1.1 million and $10.4 million in proceeds, for a combined total of approximately $19 million. Compl. ¶¶ 6, 456. The Complaint alleges that these stock sales were "unusual and suspicious in that they were all executed at times calculated to maximize their personal profit from the artificial inflation of RHD's stock price" and "were made prior to the precipitous decline in the price of RHD stock that began in late July 2007," largely when the stock was trading above $70 per share. Compl. ¶ 457. Moreover, "not one of the Defendants sold shares once the Company's stock began its precipitous decline from late July 2007 until the Company declared bankruptcy at the close of the Class Period." Compl. ¶ 457. The stock price fell 99.9% from its high of $83.90 per share on May 9, 2007 to $0.05 per share on May 29, 2009, when RHD filed for bankruptcy. Compl. ¶¶ 16, 315.

### B.    Procedural History

Beginning on October 23, 2009, several plaintiffs filed cases against Defendants alleging securities fraud violations. On June 22, 2010, this Court entered an Order granting the motion to consolidate the securities fraud cases against Defendants. (ECF No. 28) On August 19, 2010 Plaintiff filed the Consolidated Class Action Complaint (ECF No. 30), which alleges two Counts against all Defendants: Count I, for violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, and Count II, for control person liability in violation of Section 20(a) of the Securities Exchange Act. Compl. ¶¶ 474-89. Plaintiff seeks class certification, compensatory damages for all members of the purported class, reasonable costs and expenses, and other just and proper relief.

On November 10, 2010, Defendants filed the Motion to Dismiss Class Action Complaint (ECF No. 39) and supporting brief (ECF No. 40) with exhibits (ECF No. 41). Plaintiff filed his

response on January 19, 2011. (ECF No. 42) Defendants replied on March 14, 2011 (ECF No. 45) and filed a notice of supplemental authority on May 3, 2011 (ECF No. 49).

The Court heard oral argument on the motion to dismiss on May 9, 2011. Oral argument focused on the nature of the alleged misrepresentations as fact or opinion; the use of statements from corroborating witnesses in support of pleading securities law violations; and application of the recent Supreme Court case addressing pleading standards in the context of a private securities fraud action, Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011). The Court invited the parties to file letter briefs following oral argument. On May 16, 2011, Defendants submitted their letter brief. (ECF No. 52)

## III.    The Parties' Contentions

In the Motion to Dismiss, Defendants contend that Plaintiff failed to plead adequately that the Defendants had scienter and that Defendants made material misrepresentations or omissions. Defendants assert that the Complaint does not satisfy the heightened pleading standards of the PSLRA. Defendants argue that the alleged material misrepresentations fall into several categories, none of them actionable, including statements that were reported in public filings; statements that Defendants were not aware of their likelihood to mislead investors; statements of opinion; and mere puffery. Defendants argue that the confidential insider witnesses merely reflect differences of opinion between themselves and other RHD employees. Defendants seek to discredit witnesses who either had no contact with Defendants, or heard Defendants make statements internally that were consistent with their public statements.

Additionally, Defendants argue that some statements regarding future demand for yellow pages and RHD's ability to grow its online business were forward-looking statements

7

accompanied by meaningful cautionary language, covered by the PSLRA's "safe harbor" provision. Defendants contend that even if the forward-looking statements are actionable, the Complaint fails to plead that they were made by an executive with actual knowledge that the statement was false or misleading. Defendants assert that the Complaint does not adequately allege scienter based on Defendants' stock sales, which were not unusual in scope or timing. Finally, Defendants argue that the Section 20(a) claims must be dismissed for failure to state a predicate claim under Section 10(b).

In response, Plaintiff contends that the Complaint satisfies the heightened pleading standards of the PSLRA by supplying identifying details about the confidential witnesses who gave first-hand accounts about RHD's business and Defendants' conduct, and by pleading with particularity Defendants' material misrepresentations and scienter. Plaintiff asserts that Defendants are liable for their opinion statements, which had no reasonable basis and were not mere puffery. Plaintiff argues that Defendants had a duty to disclose material information about RHD's business to correct prior inaccurate, incomplete or misleading disclosures. Plaintiff contends that even Defendants' accurate statements of financial performance are actionable if the content and manner of their presentation rendered the statements misleading. Additionally, Plaintiff argues against application of the PSLRA's safe harbor provision at the motion to dismiss stage.

## IV. Legal Standard

### A. Jurisdiction

This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

**B.     Motion to Dismiss for Failure to State a Claim**

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff. Angelastro v. Prudential–Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).

To survive a motion to dismiss for failure to state a claim, the complaint must plead sufficient factual allegations, that, taken as a whole, state a facially plausible claim to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint satisfies the threshold of facial plausibility if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 556). In Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009), the Third Circuit described Iqbal as requiring a two-part analysis for a Rule 12(b)(6) motion. Id. at 210. First, the district court separates the facts averred in the complaint, which it accepts as true, from any legal conclusions in the complaint, which it may disregard. Id. at 210-11 (citing Iqbal, 129 S. Ct. at 1949). Second, the court determines whether a reasonable reading of the complaint shows that the plaintiff has a plausible claim for relief. Id. at 211.

**C.     Heightened Pleading Standard in Securities Fraud Cases**

Federal Rule of Civil Procedure 8(a)(2) requires that generally a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." However, Rule 9(b) and the PSLRA "impose heightened pleading requirements on plaintiffs who allege securities fraud." Oran v. Stafford, 226 F.3d 275, 288 (3d Cir. 2000). Rule 9(b)'s requirement

that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall

be stated with particularity" applies to securities fraud cases. In re Burlington Coat Factory Sec.

Litig., 114 F.3d 1410, 1417 (3d Cir. 1997). The PSLRA further requires the plaintiff in a private

securities action to "(1) 'specify each statement alleged to have been misleading [and] the reason

or reasons why the statement is misleading,'15 U.S.C. § 78u-4(b)(1); and (2) 'state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind,' § 78u-4(b)(2)." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321

(2007). The scienter pleading requirement under the PSLRA is more stringent than the

requirements of Rule 9(b) and "supersedes Rule 9(b) as it relates to Rule 10b-5 actions." In re

Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 277 (3d Cir. 2006) (citation omitted).

"Failure to meet the threshold pleading requirements demanded by [Rule 9(b) and the PSLRA]

justifies dismissal apart from Rule 12(b)(6)." Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,

394 F.3d 126, 145 (3d Cir. 2004).

    In Tellabs, the Supreme Court described the three-step process for considering a motion

to dismiss Section 10(b) claims. First, the district court "must, as with any motion to dismiss for

failure to plead a claim on which relief can be granted, accept all factual allegations in the

complaint as true." Tellabs, 551 U.S. at 322 (citing Leatherman v. Tarrant Cnty. Narcotics

Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993)). Second, the court must consider

the complaint in its entirety, including documents incorporated by reference and matters taken

under judicial notice, to determine "whether all of the facts alleged, taken collectively, give rise

to a strong inference of scienter." Id. at 323. Third, the court must consider "plausible opposing

inferences" to determine whether "a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 323, 324.

## V.    Discussion

Section 10(b) of the Securities Exchange Act "broadly prohibits deception, misrepresentation, and fraud 'in connection with the purchase or sale of any security.'" Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 78-79 (2006) (quoting 17 C.F.R. § 240.10b-5 (2005)).[3] Rule 10b-5 provides for liability for conduct that Section 10(b) prohibits. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 157 (2008) (citing United States v. O'Hagan, 521 U.S. 642, 651 (1997)).[4] Although the SEC has express authority to enforce Rule 10b-5, the Supreme Court recognized a private cause of action implied in the Securities Exchange Act. Id. (citing Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.,

---

[3] Under Section 10(b), it is "unlawful for any person, directly or indirectly," by means of interstate commerce, "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j (2010).

[4] Rule 10b-5 makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2011).

404 U.S. 6, 13, n.9 (1971)).[5]

To state a claim under the Section 10(b) implied cause of action, a plaintiff must allege

the following six elements:

(1) a material misrepresentation (or omission);
(2) scienter, i.e., a wrongful state of mind;
(3) a connection with the purchase or sale of a security;
(4) reliance, often referred to in cases involving public securities markets
(fraud-on-the-market cases) as "transaction causation;"
(5) economic loss; and
(6) "loss causation," i.e., a causal connection between the material misrepresentation and
the loss.

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (citations omitted).

Defendants contend that the Complaint is inadequate with respect to the first two

elements: material misrepresentation or omission, and scienter.  As will be discussed,

Defendants' arguments are not supported by the recent Supreme Court decision, Matrixx

Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011), which endorses a generous application of

the PSLRA with respect to pleading materiality and scienter under Section 10(b) and Rule 10b-5.

A.      Use of Confidential Sources

A plaintiff may plead "falsity by alleging various sources for the 'true facts' known or

recklessly disregarded by defendants," including documentary evidence and "representations of

confidential witnesses."  Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 260 (3d Cir.

2009).  The key precedential cases addressing use of confidential witnesses in pleading private

securities fraud claims under the PSLRA are California Public Employees' Retirement System v.

Chubb Corp., 394 F.3d 126 (3d Cir. 2004) and Avaya, 564 F.3d 242.  In Chubb, the Third Circuit

_____

[5] Congress later ratified the implied cause of action.  Stoneridge, 552 U.S. at 165-66.

explained that information from confidential witnesses should be examined with respect to "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Chubb, 394 F.3d at 147.[6] The facts of Chubb involved plaintiff shareholders who relied on anonymous former Chubb employees for their allegations, but did not plead detailed information about when the sources were employed, or when and how they acquired their information. Id. at 148. The Third Circuit held that the inadequate confidential source allegations did not comply with Rule 9(b) or the PSLRA. Chubb, 394 F.3d at 155. By contrast, in Avaya, plaintiff shareholders who relied on confidential witnesses for information about alleged securities fraud violations adequately described "the who, what, when, where and how" about the sources and their acquisition of information in satisfaction of the PSLRA's pleading requirements. Id. at 253, 263-64.

This Court has discussed the use of confidential informants in preparing a securities complaint in In re CIGNA Corp. Securities Litigation, No. 02-8088, 2006 WL 263631 (E.D. Pa. Jan. 31, 2006). As a general rule, complaints pursuant to the PSLRA's heightened pleading standard "rely[ing] on confidential personal sources but also on other facts . . . need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." Id. at *2 (citations omitted). The plaintiffs in CIGNA did not have to name their sources because the complaint "described [the sources] with sufficient

_____

[6]Avaya affirmed that Chubb remained good law after the Supreme Court's decision in Tellabs, concluding that where "a complaint's confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity." Avaya, 564 F.3d at 263.

particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Id. The Court discussed that as a matter of public policy, mandating identification of confidential witnesses in securities fraud litigation "would chill informants from providing critical information which may end up in the public eye." Id. at *3 (denying CIGNA's request to compel plaintiffs to identify the confidential sources relied upon in drafting the complaint).

In this case, the Court finds that the Complaint alleges with the requisite particularity "the who, what, when, where and how" about Plaintiff's confidential informants and the basis of their knowledge about the subject of this alleged securities fraud. See Avaya, 564 F.3d at 253. There are twenty-six confidential sources on whom Plaintiff relies in addition to the documentary evidence cited in the Complaint. Plaintiff identifies the basis of the sources' knowledge, including their positions, duties, and time and place of employment. Compl. ¶¶ 38-63. For example, one confidential witness is described as a former Senior Manager of Bad Debt and later Senior Manager of Strategic Planning and Analysis, who worked in the Cary, North Carolina company headquarters from August 2005 through September 2008, whose duties included meeting regularly with senior management, developing Sarbanes Oxley ("SOX") compliance and controls, coordinating internal audits and testing of controls, and setting bad dept reserves. Compl. ¶ 38. This witness, who was knowledgeable about RHD's understated bad debt, bad debt reserves, good will impairments, overstatement of cash flows, and declining sales, met quarterly with Defendants Blondy and Swanson and biannually with Defendant Bednarz to discuss topics including SOX compliance and controls, and the bad debt. Id. Another confidential witness is described as a Sales Representative in the Phoenix, Arizona office from August 2006 through

December 2009, whose duties included calls with current and potential customers, and who attended two of Defendant Swanson's presentations "regarding the status and direction of the business." Compl. ¶ 50. The Complaint alleges that the witness is knowledgeable about declining sales in the Phoenix office and the regular production of detailed sales reports, and names the witness's chain of command up to the Vice President level. Id.

The remaining twenty-four sources are identified in similar detail to avoid the infirmities in Chubb, where the absence of detail required the court "to speculate whether the anonymous sources obtained the information they purport to possess by firsthand knowledge or rumor." Chubb, 394 F.3d at 148. As in CIGNA, Plaintiff also relied upon documentary evidence to support his claims that Defendants' statements were actually false, eliminating any requirement that Plaintiff reveal the sources' names. See CIGNA, 2006 WL 263631 at *2. For example, Plaintiff attached a sample sales report dated September 23, 3008 from the Phoenix office showing an "average net gain" of $-6263.40 per sales representative, and net losses between $2,335 and $17,831 for 21 of the 23 sales representatives. Compl. Ex. A. The Complaint also relies on documents not attached, such as an Excel spreadsheet charting a $1.4 million decline in "Total Local Print Sales" for Near West Cook County, Illinois from 2006 to 2007, showing net losses in RHD's print business of 6.8% in 2006 and 19% in 2007. Compl. ¶ 172. The Court finds that Plaintiff has pled with particularity the identity of its confidential sources, who support Plaintiff's claim that Defendants possessed knowledge about the true condition of RHD's yellow pages business.

### B.    Materiality

In Matrixx, the Supreme Court recently reaffirmed that the "materiality requirement is

satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Matrixx, 130 S. Ct. at 1318 (citing Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). The "total mix" standard requires a "contextual inquiry" that is "fact-specific." Id. at 1321 (citing Basic, 485 U.S. at 236).

The plaintiff investor in Matrixx alleged securities fraud based on the pharmaceutical company's failure to disclose reports of adverse events associated with a product that were not statistically significant. Id. at 1314-16. The district court granted the pharmaceutical company's motion to dismiss for failure to plead the elements of a material misstatement or omission and scienter. Id. at 1317. The Ninth Circuit reversed, finding that a reasonable shareholder could have found the adverse events to be material. Id. The Supreme Court agreed with the Ninth Circuit and applied the "total mix" test, determining that the "source, content, and context" of the adverse event reports suggested "that reasonable investors would have viewed reports of adverse events as material even though the reports did not provide statistically significant evidence of a causal link." Id. at 1321.

In Matrixx, the Supreme Court explained that although there is no general duty to disclose material information, the duty arises "only when necessary 'to make. . . statements made, in the light of the circumstances under which they were made, not misleading." Id. at 1317 (citing 17 C.F.R. § 240.10b-5). Matrixx's duty to disclose material information about the adverse event reports and the "significant risk to the commercial viability of Matrixx's leading product" arose from its own public statements predicting future revenue growth, public denials of reported safety hazards with the drug as "completely unfounded and misleading," and statements

16

that the drug's safety and efficacy were "well established." Id. at 1323. The context of the statements created a substantial likelihood that a reasonable investor would find information about the adverse event reports significantly altered the "total mix" of available information. Id.

Statements of opinion may be actionable in the securities fraud context. In Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991), the Supreme Court held that defendants could be liable for "statements of reasons, opinions, or beliefs" where plaintiffs had "objective evidence . . . that the statement also expressly or impliedly asserted something false or misleading about its subject matter." Id. at 1091, 1095-96. For example, statements about "high" value and the "fair" terms of a merger "in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." Id. at 1093 (holding that plaintiffs presented sufficient facts about the bank's assets and operations to prove that the directors' statements about value were misleading). The Third Circuit interpreted Virginia Bankshares as establishing that "opinions, predictions and other forward-looking statements are not per se inactionable under the securities laws. Rather, such statements of 'soft information' may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them." In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig., 7 F.3d 357, 368 (3d Cir. 1993) (citations omitted) (holding that no reasonable jury could conclude that the opinion regarding the partnership's ability to repay bonds would materially influence a reasonable investor, where there were clear, precise warnings regarding the bond venture's exceptionally risky and speculative nature).

By contrast, a statement understood by reasonable investors to be mere "puffery," consisting of "subjective analysis or extrapolations, such as opinions, motives and intentions, or

general statements of optimism," is not actionable. In re Aetna, Inc. Sec. Litig., 617 F.3d 272,

283 (3d Cir. 2010). In In re Aetna, the Third Circuit found that "oblique references to Aetna's

pricing policy" were "too vague to ascertain anything on which a reasonable investor might rely."

Id. at 284. Specifically, the court held that a corporate officer's statement on a conference call

with analysts regarding "solid and balanced growth that is representative of our dedication to

disciplined pricing" was immaterial as a matter of law, where the officer also made statements

that "at a minimum convey the complexity of Aetna's business, diversity of its customers, and

variable nature of its portfolio of insurance contracts." Id. Similarly, in In re Advanta Corp.

Securities Litigation, 180 F.3d 525 (3d Cir. 1999), overruled in part on other grounds, Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), the defendants' positive portrayals of

the company, such as the statement that "Advanta's credit quality continues to be among the best

in the industry," were inactionable "mere puffery." Id. at 538-39. The court was "skeptical that

plaintiffs or any other reasonable investors would make investment decisions based on the

positive portrayals." Id. at 539.

The Complaint in this case alleges with sufficient particularity that Defendants made

numerous statements about the strength and stability of the print yellow pages market. See, e.g.,

Compl. ¶¶ 281, 289, 299, 304, 346, 408. The Defendants' statements of supposed opinion about

the health and growth of the yellow pages industry, like the statements in Virginia Bankshares,

used terms in a commercial context that investors would reasonably understand as resting on a

factual basis, such as claims about the strength of the return on investment ("ROI"). Compl. ¶¶

287, 299, 317, 346, 357. Moreover, Defendants' statements were not vague statements of

optimism, as in In re Aetna. Rather, Defendants flatly denied the existence of a secular shift in

18

the local search industry and stated that economic "cyclical" factors caused the decline in business. Compl. ¶¶ 317-18, 346-47, 355, 357, 364, 371, 381, 400, 413, 419, 434.

At oral argument, Defendants characterized ¶ 150 of the Complaint as an example of an inactionable opinion statement, reflecting internal debate at RHD about the cause of the decline in the print yellow pages market.[7] Defendants contend that <u>Virginia Bankshares</u>, <u>In re Advanta</u>, <u>In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation</u>, 543 F.3d 150 (3d Cir. 2008), <u>aff'd</u>, 130 S. Ct. 1784 (2010), and <u>Alaska Electrical Pension Fund v. Pharmacia Corp.</u>, 554 F.3d 342 (3d Cir. 2009), support their position.

In <u>Virginia Bankshares</u>, the Supreme Court explained that a "statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending" was material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" <u>Virginia Bankshares</u>, 501 U.S. at 1090-91 (quoting <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)). Directors could be liable for material opinions if "made with knowledge that the directors did not hold the beliefs or opinions expressed." <u>Id.</u> at 1090. The directors' opinions on the fair value of a proposed merger

---

[7] Paragraph 150 of the Complaint states:

In fact, according to the confidential witness, a number of personnel from the Finance and Accounting group contested Blondy's assertion, including the former employee, because it was internally obvious that the downturn was indeed secular based on multiple and various sources of data. The employees who voiced their objections to Blondy following his assertion that the downturn was "not secular" typically only voiced their objections once, as Blondy "did not want to hear it." Thus, in the face of clear and specific evidence to the contrary, Blondy misrepresented to the market throughout the Class Period that RHD was only experiencing temporary issues, not a permanent shift away from print yellow pages usage.

were actionable because it was substantially likely that a reasonable investor would have found the information important, and the directors had conflicting material information about the merger's true value. Id. at 1096-98. See also In re Merck, 543 F.3d at 166-67 (plaintiff investors sufficiently alleged that defendants made "falsely-held statements of opinion or belief" by touting the drug Vioxx's safety profile and commercial prospects in the face of contradictory information); Alaska Elec. Pension Fund, 554 F.3d at 348 (recognizing that a falsely-held opinion about a clinical study could be actionable, and vacating summary judgment for defendants on statute of limitations grounds because investors were not on inquiry notice of the securities fraud).

Rather than advance Defendants' argument, these cases support the Court's finding that Plaintiff alleged in ¶ 150 an actionable opinion statement. The Complaint alleges that Defendant Blondy made statements of opinion that the downturn in the yellow pages market was temporary. This statement is material because a reasonable shareholder would find it important whether the decline in yellow pages advertising was due to a temporary downturn or a permanent, secular shift. The paragraph further alleges that Blondy did not hold the opinion in earnest because he had access to data showing, and RHD's Finance and Accounting Group conveyed to him, that the downturn was actually secular. Compl. ¶ 150. The alleged statement satisfies the requirements for liability of being both material and falsely-held. This statement is distinguishable from the "vague and general statement of optimism" held to be inactionable in In re Advanta, 180 F.3d at 538-39. Indeed, the allegation in ¶ 150 does not express optimism at all, but rather addresses the source and permanence of the decline in the yellow pages business. Read in the light most favorable to Plaintiff, ¶ 150 is an example of a particularized allegation of an actionable opinion.

Applying the "total mix" test of Matrixx, the court finds that there is a substantial

likelihood that a reasonable investor would have wanted to know the information that RHD

possessed about declining usage of print yellow pages directories, the substantially discounted

sales of yellow pages ads, and the lower margins on Internet advertising sales that prevented

RHD from making up the loss of revenue from print ads. The Complaint adequately alleges

material misrepresentations and omissions under Section 10(b).

C.    **Scienter**

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that

the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or

defraud.'" Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94

and n.12 (1976)). The heightened pleading standard under the PSLRA requires the court to

examine "whether all of the facts alleged, taken collectively, give rise to a strong inference of

scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id.

at 323. The Supreme Court held that a "strong" inference of scienter is one that is "more than

merely plausible or reasonable-it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent." Id. at 313. A plaintiff may rely on confidential witnesses to

establish the basis of scienter allegations. See Avaya, 564 F.3d at 268-69 (holding that the

totality of the facts established a strong inference of scienter with respect to statements regarding

revenue growth forecasting, where confidential witnesses provided information that the company

engaged in widespread discounting of numerous product lines and accounts, a practice that the

chief financial officer publicly denied).

In Matrixx, the Supreme Court applied the Tellabs test and held that a holistic reading of

the complaint gave rise to a strong inference that the defendant company recklessly or intentionally withheld adverse event reports relating to a leading product because of concern about their "likely effect on the market." Id. at 1324-25 (citing Tellabs, 551 U.S. at 323). This inference was as compelling as the competing inference, championed by defendants, that they withheld the adverse event reports because they were not statistically significant and "simply thought the reports did not indicate anything meaningful about adverse reactions." Id. at 1324.

In evaluating scienter, the court may consider allegations of the defendant's motive and opportunity to commit fraud. Avaya, 564 F.3d at 276-77. The plaintiff must allege "'a concrete and personal benefit to the individual defendants resulting from this fraud'" rather than a general motivation to make the corporation profitable. Id. at 278 (quoting GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004)); see also Tellabs, 551 U.S. at 325 (an allegation of "personal financial gain may weigh heavily in favor of a scienter inference"). For example, in GSC Partners, the Third Circuit rejected the plaintiff investors' allegation that corporate officers and directors were motived to commit fraud to ensure the completion of a proposed merger from which they would receive financial benefit, because the motive was too general to give rise to a strong inference of fraudulent intent. GSC Partners, 368 F.3d at 237-38.

When the defendant's alleged motive is profiting from the sale of company stock, the Court looks at whether the defendant's stock sale was unusual in timing or scope. Suprema, 438 F.3d at 277. In Suprema, the Third Circuit examined factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved," "whether the sales were 'normal and routine,' and whether the profits were substantial relative to the seller's ordinary compensation." Id. (citations omitted). The Third Circuit held

that the plaintiffs adequately pled motive by stating with particularity facts about the quantity and timing of sales and the proceeds earned. Id. at 277-78. In Avaya, on the other hand, the court rejected a motive allegation as giving rise to an inference of scienter where the defendants' stock sales "remained consistent year-over-year." Avaya, 564 F.3d at 279.

Here, the Court finds that the Complaint sufficiently pleads with particularity that Defendants had scienter, based on the information from confidential sources and documents cited in the Complaint. Plaintiff has alleged a detailed set of facts that Defendants had information about the true condition of RHD's business and cause of its decline, including statements by the Defendants themselves about how they "recorded" sales, "closely monitor[ed] why advertisers reduce or cancel their programs," and "spent an inordinate amount of time on" the issue of declining usage. Compl. ¶¶ 281, 357, 364. Further, the confidential witnesses corroborate that the Defendants had access to sales data and internal reports, and had meetings and calls with company insiders about the performance of the business. See, e.g., Compl. ¶¶ 81, 82, 143, 146, 150, 158, 160-170, 183, 186, 213, 223, 226. The inference that Defendants withheld material information because they did not want the market to learn that a secular shift was eroding the commercial viability of their key product, the yellow pages, is at least as cogent and compelling as the opposing inference that Defendants did not know or did not believe a secular shift was occurring.

Moreover, the Complaint alleges a motive of personal financial gain that bolsters the inference of scienter. Plaintiff alleges that Defendants' stock sales were unusual in timing and scope. Compl. ¶ 457. The Complaint alleges that Defendants made numerous trades when the stock was priced between $70 per share and its peak of $83.90 per share. Compl. ¶¶ 6, 456.

23

Following this burst of sales, Defendants did not make any trades from July 2007 until the end of

the Class Period. Compl. ¶ 457. The Defendants collectively earned almost $19 million in

proceeds, which was equal to approximately one-third of their total $60 million compensation

between 2006 and 2009. Compl. ¶¶ 258, 456. The Complaint sufficiently pleads that

Defendants had scienter.

### D. Applicability of Safe Harbor

Defendants argue that the claims should be dismissed under the PSLRA's "safe harbor"

provision, 15 U.S.C. § 78u-5(c). The safe harbor provision "immunizes from liability any

forward-looking statement, provided that: the statement is identified as such and accompanied by

meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was

made with actual knowledge of its falsehood." Avaya, 564 F.3d at 254. An adequate cautionary

statement "must be substantive and tailored to the specific future projections, estimates or

opinions in the prospectus which the plaintiffs challenge." Id. at 256 (citing GSC Partners, 368

F.3d at 243 n.3). A vague or boilerplate disclaimer warning of general risks is inadequate. Id.

(citing GSC Partners, 368 F.3d at 243 n.3). The defendant must also have "actual knowledge of

the falsehood of the forecast-related statements" to be held liable for a forward-looking

statement. Id. at 258. Statements about present or historical facts that can be verified at the time

they are made are not forward-looking statements protected by the safe harbor. In re

NutriSystem, Inc. Sec. Litig., 653 F. Supp. 2d 563, 579 (E.D. Pa. 2009). "'[A] mixed

present/future statement is not entitled to the safe harbor with respect to the part of the statement

that refers to the present.'" Avaya, 564 F.3d at 255 (quoting Tellabs, 513 F.3d at 705).

Courts apply the safe harbor provision at the motion to dismiss stage. In Avaya, the Third

Circuit held that the PSLRA protected statements that the company was "on track" and positioned to meet yearly goals, where those statements could not be distinguished from the future projections and were accompanied by extensive, specific cautionary language explicitly warning about the risk of "price and product competition," the issue that shareholders claimed Avaya did not disclose. Id. at 257. Additionally, in conference calls and press releases, the defendant officers explained the risks and uncertainties associated with their forward-looking statements and specifically referenced the company's SEC filings. Id. at 257-58. Moreover, the complaint did not allege sufficiently that the defendants had actual knowledge of the falsity of their forward-looking statements. Id. at 258-59. Therefore, the Third Circuit affirmed the district court's dismissal of the defendants' forward-looking statements as protected by the safe harbor provision.

Here, Plaintiffs allege that Defendants made some mixed statements with respect to present and future projections. For example, the March 15, 2007 10-K stated that "Our Plus companion directories have proven capable of recapturing and even growing usage share in highly competitive markets. . . We expect overall directory usage to grow, largely due to steady growth of Internet directory usage." Compl. ¶ 300. The part of the statement that refers to present growth would not be protected by the safe harbor provision. Moreover, although the attachments to the Complaint show that Defendants included a "Safe Harbor Statement" in each of their media presentations, none of these statements warned of a secular decline, the issue that Plaintiff here claims Defendant failed to disclose. Compl. Ex. B at 3; Ex. C at 3, Ex. D at 3. 254. Therefore, the cautionary statements are inadequate to protect Defendants because they are not "tailored to the specific future projections, estimates or opinions" that Plaintiff challenges in

this lawsuit. See Avaya, 564 F.3d at 256. Lastly, the Complaint also alleges that the Defendants had actual knowledge of the inaccuracies of their projections for growth, based on the insider reports and meetings, as discussed above. See, e.g., Compl. ¶¶ 81, 82, 143, 146, 150, 158, 160-170, 183, 186, 213, 223, 226. Therefore, the Court will not dismiss claims at this stage pursuant to the safe harbor provision.

### E.      Section 20(a)

Section 20(a) "imposes joint and several liability upon one who controls a violator of Section 10(b)." Suprema, 438 F.3d at 284 (citing 15 U.S.C. § 78t(a)). To establish a Section 20(a) violation, "the plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws." Id. (citing In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004)). In Suprema, the shareholders pled claims under Section 20(a) against the defendant officers of Suprema, a corporation that was named as a primary violator of the securities fraud laws. Id. at 285. However, Suprema was not named as a defendant because the corporation was bankrupt. Id. The Third Circuit rejected the argument that the senior executives of the bankrupt corporation could avoid liability because the corporation was not a defendant. Id. at 285-86. The complaint "detailed the allegations of materially false and misleading statements and omissions in SEC filings and asserted that Suprema should be held primarily liable under Section 20(a)," and also "detailed the manner in which [the defendant officers] are alleged to have tightly controlled Suprema's business and operations and acted as culpable participants in the fraud charges. " Id. at 286 (vacating dismissal of Section 20(a) claims because plaintiffs stated a claim against the corporate officers).

Here, as in <u>Suprema</u>, the Complaint alleges Section 20(a) claims against officers and directors of a company that filed for bankruptcy. The Complaint alleges that RHD engaged in fraud and that Defendants had high-level positions within the Company. Further, Defendants participated in or were aware of RHD's operations, and influenced and controlled RHD's operations and decision-making, including the content and dissemination of its press releases, SEC filings, and conference calls. Compl. ¶¶ 477-79. In addition to stating the predicate Section 10(b) violation, the Complaint states a claim against Defendants under Section 20(a).

## VI. Conclusion

Applying controlling Supreme Court and Third Circuit precedent, the Court finds that Plaintiff met his burden under the PSLRA to plead materiality and scienter with particularity. Defendants' motion to dismiss claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5, and Section 20(a) is denied. An appropriate Order follows.

O:\DE Cases\09-799 Local 731 v. Swanson\Local 731 v. Swanson MTD Memorandum.wpd

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LOCAL 731 I.B. OF T. EXCAVATORS      :      CIVIL ACTION
AND PAVERS PENSION TRUST FUND, et al.

     :

       v.

     :      NO. 09-799

DAVID C. SWANSON, et al.

### ORDER RE: MOTION TO DISMISS

AND NOW, this 14th day of June, 2011, upon careful consideration of Defendants'

Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 39) and the responses

thereto, and following oral argument on May 9, 2011, and for the reasons stated in the

accompanying Memorandum, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

_____

Michael M. Baylson, U.S.D.J.

O:\DE Cases\09-799 Local 731 v. Swanson\Local 731 v. Swanson MTD Order.wpd